UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBIN J. VIERRA,<br><br>              Plaintiff,<br><br>     v.<br><br>MICHAEL J. ASTRUE,<br><br>              Defendants. | Case No.: C 06-7785 PVT<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to the Procedural Order for Social Security Review Actions, Plaintiff Robin J. Vierra ("Vierra") filed a motion for summary judgment.[1] Defendant, the Commissioner of the Social Security Administration ("Commissioner"), opposed the motion and filed a cross-motion for summary judgment. Vierra filed a response to the Commissioner's cross-motion. Both parties have consented to proceed before a United States Magistrate Judge. Based on the administrative record and the briefs and arguments presented,

IT IS HEREBY ORDERED that, for the reasons discussed herein, Vierra's motion for summary judgment is GRANTED; and Defendant's motion for summary judgment is DENIED.

---

[1] The holding of this court is limited to the facts and the particular circumstances underlying the present motion.

Order, *page 1*

## I. PROCEDURAL AND FACTUAL BACKGROUND

Vierra filed an application for Supplemental Security Income (SSI) benefits on January 23, 2003. (Tr. 17.) Following denial of her claim initially, and upon reconsideration, Vierra requested a hearing, which took place in February 2004. *Id.* In a decision dated June 8, 2004, Vierra was found to have become disabled as of the date of her application for SSI, which was filed in March of 2003, but had an earlier protective filing date. *Id.* The Appeals Council vacated that decision because there was an error of law. *Id.* The principle errors were having found the claimant had past relevant work and having failed to indicate whether there were jobs available in significant numbers that she could perform. *Id.* A new hearing was held on February 1, 2006 before Sandra K. Rogers, Administrative Law Judge ("ALJ"). *Id.* On April 24, 2006, the ALJ rendered a partially favorable decision, finding her "disabled" as of September 1, 2005, but not sooner. (Tr. 14-26.) Vierra filed a Request for Review of Hearing Decision which the Appeals Council denied. Consequently, the ALJ's decision became the Commissioner's final decision.

### A. VIERRA'S AGE, EDUCATION, AND WORK EXPERIENCE

Vierra was 49 years old (DOB 9/28/1952) at the alleged onset date of disability (4/16/02). (Tr. 87.) She attended school through the 9th grade. (Tr. 101.) She has no relevant past work. (Tr. 18.)

### B. VIERRA'S PERTINENT HEARING TESTIMONY

Vierra testified she last worked for six months as a yard supervisor at Graham Middle School, where she watched kids for one hour per day after lunch.

Vierra testified that since 2002 she had headaches and tumors which would grow back after removal. She had tumors on different body parts. The tumor on her optic nerve in her eye caused her right eye to become blurry sometimes. Dr. Lifschitz, who removed one of Vierra's brain tumors in November 2005, stated that there was a correlation between her seizures and her tumors. She did not have a prior surgery because previous MRIs did not show the tumor in her brain. Before the surgery, her condition remained consistent instead of changing drastically. She did not suddenly feel worse, get an MRI taken, and then have surgery; on the contrary, her condition was ongoing and they found something on the MRI.

1  She began having seizures, although she did not know they were seizures, in August 2003.
2  The seizures caused her legs to shake and she would become lightheaded.  They lasted about 10 to
3  20 seconds and occurred three to four times per week.  She would have them every couple weeks.
4  She had no forewarning that she was going to have a seizure episode.  Her seizures in October 2005
5  differed from the seizures in 2003 because her legs would shake constantly, far worse than before,
6  lasting for about 20 seconds, about five or six times per day.  Her headaches also increased in
7  severity.  Vierra maintained that she was disabled since 2003 because she had to lie down due to
8  headaches, which returned after two hours despite taking Advil. Her headaches kept getting worse.

9  Vierra stated that in 2003 she could babysit her nieces, but she could not do that anymore
10 because she did not know when a seizure would come on.  Vierra stated that she would have tried
11 being a yard monitor or crossing guard full time in 2003 if the positions were available.  However,
12 she would have been concerned about her appearance and constant headaches.  She doubted that she
13 could have done it all the time, especially if she could not take any other breaks other than lunch
14 time.  Her headaches would get worse.

15 She acted as a babysitter for her nieces, watching them in the morning in the summers while
16 they did not go to school.  The children were age 10, 7, and 6.

17 Vierra stated that one of her medications caused her to break out in hives.  She did not take
18 Codeine because it causes dry heaves whether or not she had eaten.  Her Dilantin causes her to be
19 drowsy for 20 to 30 minutes afterwards and then she falls asleep.  She began taking Dilantin the day
20 of her surgery.  For three to four years prior to the day of her surgery, her medication Paxil had made
21 her sleepy and fall asleep.

22     **C.**    **HEARING TESTIMONY OF VOCATIONAL EXPERT**

23 James Westman (Westman) appeared at the request of the ALJ to offer vocational testimony.
24 Westman stated that there was no substantial past relevant work.  Westman stated that based on the
25 assessment of her treating physician, Vierra had a residual functional capacity for less than a full
26 range of sedentary work.  If however, reliance were based on the DDS consultative examiner's
27 opinion, i.e. no physical restrictions and with a GAF of 60, there would be simple, unskilled type of
28 positions that were available for her to perform.  Westman indicated that despite having mild to

moderate limitations in maintaining attention and concentration, which would correlate to having limitations 10% to 20% of an 8 hour workday, Vierra could perform "light," "unskilled" work. Westman gave examples of housekeeping cleaner, which is light and unskilled, and of which there are about 4,500 positions; Food prep, which is light and unskilled, and of which there are about 3,800 jobs; and laundry folder, which is light and unskilled, and of which there are 500 positions available.

Westman agreed that if someone became drowsy and fell asleep during the day, she could not perform even the entry-level unskilled occupations.

**D.   RELEVANT MEDICAL EVIDENCE**

On April 12, 2002, Vierra presented to P.B. Iyer, M.D. with left wrist injury and wrist range of motion diminished.

On December 16, 2002, David Cahn, M.D. noted neurofibromatosis and also noted that Vierra took Paxil for her depression.

A CT of the head on January 20, 2003 revealed:

> The left ventral parietal 2.2 cm mass abutting the left lateral ventricle is consistent with a low grade glioma. A subependymal astrocytoma, commonly associated with tuberous sclerosis, could have such an appearance.

An addendum to the head CT scan stated:

> There are multiple small nodular areas within the scalp with contrast enhancement consistent with subcutaneous neurofibromas. Please see previous report regarding left paraventricular low grade glioma.

Sometime on or before February 28, 2003,[2] Dr. Cahn completed a Physical Capacities questionnaire for the State of California in which he indicated that in an 8 hour workday Vierra could stand or walk for 2 to 4 hours at one time and could sit for 2 to 4 hours at one time. Dr. Cahn did not indicate the total number of hours Vierra could stand, walk or sit during an 8 hour workday. On the second page of the Physical Capacities questionnaire, Dr. Cahn opined that Vierra could occasionally lift 10 pounds in an 8 hour workday. He stated that she could only "occasionally"

---

[2]   The document at pages 147-48 of the Transcript bears two dates: 12/10/02 and 2/28/03. The document at page 144 bears the same two dates. It appears likely that these documents were prepared by someone writing in Vierra's name and the December 10, 2002 date, paged 144 was signed by Vierra on that date, and then the documents were provided to Dr. Cahn who completed his portions on or before February 28, 2003.

balance, kneel, crouch, crawl, reach below knees, reach waist to chest, reach chest to shoulders, and reach above shoulders.

In the "Statement of Provider" section of a medical information form also signed February 28, 2003, Dr. Cahn indicated that Vierra's condition (neurofibromatosis) is chronic and expected to last for a lifetime. He also stated that she has "limitations that affect her ability to work or participate in education or training." He checked the "no" box in response to Question 4 "Is this person able to work?" However he wrote in "not sure" on the dotted line between the question and the "yes" and "no" boxes.

On April 26, 2003, Vierra attended a consultative examination with a Department of Disability Services (DDS) physician. She had multiple lesions through her body. Vierra stated that it was difficult for her to get a job due to her lesions. Her medications included Paxil, Lipitor, and hypertension medication. The physician found no significant abnormalities with regard to range of motion or movements.restrictions.[3]

On May 9, 2003, a DDS psychiatrist diagnosed Mood disorder, depressed, secondary to medical condition. The psychiatrist wrote:

> The patient has depression that has been going on for the last one year. Secondary to depression, the patient can have moderate difficulty interacting with the public, coworkers and supervisors. She can have moderate difficulty with remembering, understanding and carrying out complex job instructions. The patient can have mild to moderate difficulty with maintaining attention, concentration, persistence and pace in a normal eight hour a day job setting.

A Mental Residual Functional Capacity Assessment dated June 4, 2003 completed by Donald Walk, M.D. at the request of DDS stated that Virrra is "moderately limited" in her ability to "carry out detailed instructions" and "maintain attention and concentration for extended periods." Furthermore, Vierra is "markedly limited" in her ability to "interact appropriately with the general public." She also had "moderate" limitations in her ability o complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and in the ability to get

---

[3] The quote Vierra cites from page 156 of the transcript is not relevant to this case because it relates to a different claimant. The other person's name appears at the very top of the page. The inclusion of this page in the transcript is thus erroneous.

along with coworkers or peers without distracting them or exhibiting behavioral extremes. Additionally, she showed "marked" imitations in maintaining social functioning; "moderate" limitations in the activities of daily living; and "moderate" limitations in maintaining concentration, persistence, or pace.

In a Psychiatric Review Technique form dated June 4, 2003, Ida M. Hilliard, M.D. reported that Vierra suffered from Affective and Anxiety-Related Disorders. She indicated Vierra's Affective Disorder consisted of a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by . . . Sleep disturbance, psychomotor agitation or retardation, increased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking." She indicated Vierra's Anxiety-Related Disorder consisted of "generalized persistent anxiety accompanied by . . . motor tension."

An MRI of the brain on August 15, 2005 revealed:

- A 2 x 2 x 2.5 cm enhancing left periventricular mass lesion, likely an astrocytoma;

- Thickened left optic nerve, suspicious for presence of an optic nerve glioma, with no definite chiasmatic extension;

- Small punctuate foci of enhancement in the right inferior cerebellum which could be due to normal vessels, however, follow-up is recommended.

An ECG of November 21, 2005 was abnormal, while an EEG of the same date was normal.

An MRI of the brain on November 21, 2005 revealed:

- Intraaxial heterogeneous enhancing mass seen involving the periventricular/deep white matter of the left parietal lobe extending inferiorly to the superior aspect of the left thalamus. The differential diagnosis primarily includes a primary glial neoplasm such as a glioma. A solitary metastatic focus is also in the differential diagnosis.

- A few punctuate areas of increased signal intensity noted in the periventricular and subcortical white matter as well as some patchy increased signal seen within the pons. These could represent areas of chronic ischemic change. Suggest clinical correlation regarding risk factors for advanced atherosclerotic disease/cerebrovascular disease.

- Small subcutaneous nodules seen in the scalp. Suggest clinical correlation.

On November 21, 2005, Vierra underwent a surgery of "stereotatic biopsy of tumor with intraoperative MRI Cybon guidance" for her diagnosis of left parietal lobe tumor.

On November 22, 2005, an MRI of the cervical spine revealed:

- Somewhat limited examination due to lack of intravenous contrast and motion artifact. If there is persistent clinical concern regarding a possible cord lesion, suggest follow-up examination with Gadolinium contrast.

- Slight scoliosis of the cervical spine.

- No significant canal stenosis or foraminal stenosis is identified.

- Multiple subcutaneous nodules identified. The patient does have a history of neurofibromatosis and these most likely represent multiple neurofibromas.

A November 23, 2005 CT of the head revealed:

- Status post left frontal craniotomy with associated post-surgical changes. Small amount of hemorrhage is present in the left frontal lobe and within the left lateral ventricle. Some hemorrhage may be present within the 2.3 cm mass in the left periventricular white matter.

- There is a small amount of fat in the left frontal extraaxial space in the site of the craniotomy. Please correlate with the patient's surgical history.

A CT of the head on December 13, 2005 revealed:

- Evolving and improving post-biopsy change in the left hemisphere;

- Stable left deep parenchymal mass with central calcifications. No definite progression in size visualized;

- Stable old appearing lacunar change in the basal ganglia regions bilaterally;

- No new or progressive abnormality visualized.

On January 31, 2006, Dr. Cahn determined that Vierra had not been capable of performing sustained sedentary work on a regular and continuing basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule. Dr. Cahn opined that even if Vierra had the freedom to alternate sitting and standing during the work day, she would still be unable to perform sedentary work. Dr. Cahn gave the following limitations:

- Sit for 30 minutes at one time before requiring a rest or an alternative position;

- Stand for 30 minutes at one time before requiring a rest or an alternative position;

- Walk for 30 minutes at one time before requiring a rest or an alternative position;

- Must lie down for 30 minutes at one time before requiring a rest or an alternative position;

- Sit for 30 minutes total during the entire 8 hour workday;
- Stand for 30 minutes total during the entire 8 hour workday;
- Walk for 30 minutes total during the entire 8 hour workday;
- Lie down for 30 minutes total during the entire 8 hour workday;
- Lift and carry 0 to 5 pounds for 30 minutes on a regular and continuing basis;
- Lift and carry 6 to 10 pounds for 30 minutes on a regular and continuing basis;
- Reach, handle, finger, and feel for less than 30 minutes total in an 8 hour workday;
- Stoop, kneel, and crouch for less than 30 minutes total in an 8 hour workday.

Dr. Cahn explained Vierra's need to alternate positions: "Patient has seizures from the brain tumor and surgery."

### D.   THE ALJ'S DECISION

At step one, the ALJ determined that Vierra had not engaged in substantial gainful activity during the relevant period.

At step two, the ALJ decided that Vierra has a "severe" medical impairment.

At step three, the ALJ found that Vierra did not have an impairment that met or medically equaled a listed impairment.

At step four, the ALJ opined that Vierra does not have work that may be considered as past relevant work

At step five, the ALJ held that Vierra could perform other work.'

The ALJ determined that Vierra suffered from the "severe" impairments of seizure disorder, status post left parietal lesion, neurofibromatosis, and depression. The ALJ decided that prior to September 1, 2005, Vierra had the residual functional capacity to perform a wide range of sedentary, light, and medium work activity. The ALJ opined that since September 1, 2005, Vierra has had the residual functional capacity to perform less than a full range of sedentary work; her increasing seizure activity imposes both exertional and nonexertional limitations, including disorientation, disequilibrium, and the need for periods of rest. The ALJ decided that prior to September 1, 2005 there were a significant number of jobs in the national economy that Vierra could

have performed. The ALJ also determined that beginning on September 1, 2005 there were not a significant number of jobs in the national economy that Vierra could perform. As such, the ALJ concluded that Vierra was not disabled prior to September 1, 2005, but became disabled on that date and continued to be disabled through the date of the decision.

## II.  LEGAL STANDARDS

To qualify for disability benefits, a claimant must show that a medically determinable physical or mental impairment prevents her from engaging in substantial gainful activity and that the impairment is expected to last for a continuous period of at least twelve months (or result in death). *See* 42 U.S.C. § 423(d)(1)(A).

A five-step sequential process is used to determine whether a claimant is "disabled." *See* 20 C.F.R. § 404.1520. The first step is to consider whether the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the Commissioner proceeds to step two. The second step is to assess whether the claimant suffers from a "severe" impairment. If not, the claimant is not disabled. If so, the Commissioner proceeds to step three. The third step is to examine whether the claimant's impairment or combination of impairments meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1. If so, the claimant is automatically deemed disabled. If not, the Commissioner proceeds to step four. The fourth step is to determine whether the claimant is capable of performing her past relevant work. If so, she is not disabled. If not, the Commissioner proceeds to step five. Finally, the fifth step is to determine whether the claimant has the residual functional capacity to perform any other substantial gainful activity in the national economy. If not, the claimant is disabled. The burden lies with the claimant to establish steps one through four. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). In step five, the burden shifts to the Commissioner. *Id*.

In reviewing a denial of Social Security disability benefits, courts will set aside an ALJ's decision only if that decision is based on legal error or the findings of fact are not supported by substantial evidence in the record taken as a whole. *Tacket*, 180 F.3d at 1097-98. Substantial evidence is "more than a mere scintilla" but "less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (citation omitted); *see also Desrosiers v. Secretary of Health & Human Serv.,* 846 F. 2d 573, 576 (9th Cir. 1988).

While courts must look at the record as a whole, considering both evidence that supports and that undermines the ALJ's findings, it is the ALJ's function to resolve conflicts in the evidence. *See Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016 (9th Cir. 1992). However, even if substantial evidence supports the ALJ's factual findings, the decision must nonetheless be set aside if the ALJ applied improper legal standards in reaching the decision. See *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

When a claimant demonstrates the existence of a condition that would cause some degree of pain or dysfunction, the ALJ must articulate specific, convincing reasons for rejecting the claimant's subjective testimony regarding his pain and limitations. *See, Fair v. Bowen*, 885 F.2d 597, 601-04 (9th Cir. 1989); *see also, e.g., Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (9th Cir. 2001). An ALJ may not reject a claimant's statements regarding her limitations merely because they are not fully corroborated by objective evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 343-45 (9th Cir. 1991) (en banc). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

An ALJ must follow the same standard when discussing a claimant's testimony regarding limitations due to the side effects of medications. *See Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 586 (9th Cir. 1988) ("*Varney I*"). In *Varney*, the Ninth Circuit explained that:

> "Like pain, the side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process. Also like pain, side effects can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as to their limiting effects should not be trivialized. Therefore, if the Secretary chooses to disregard a claimant's testimony as to the subjective limitations of side effects, he must support that decision with specific findings similar to those required for excess pain testimony, as long as the side effects are in fact associated with the claimant's medication(s)."

Where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996); *see also Varney v. Secretary of Health and*

*Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988) (*Varney II*"). More specifically, a court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if: 1.) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2.) there are no outstanding issues that must be resolved before a determination of disability can be made; and 3.) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *See Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

### III.   DISCUSSION

#### A.   THE ALJ PROPERLY RELIED ON THE VOCATIONAL EXPERT'S TESTIMONY

Vierra complains that the vocational expert did not cite the D.O.T. codes upon which he relied, and that that somehow created a conflict between his testimony and the D.O.T. However, the vocational expert sufficiently identified the jobs he was discussing. There is no "apparent conflict" between the vocational expert's testimony and the D.O.T. that needs to be resolved as there was in *Massachi v. Astrue*, 486 F.3d 1149 (9th Cir. 2007). Thus, although under recently enunciated Ninth Circuit law the ALJ committed error by not asking the vocational expert if his testimony was consistent with the D.O.T., that error was harmless. *See Massachi v. Astrue*, 486 F.3d at 1154 n.19.

#### B.   THE ALJ ERRED IN REJECTING VIERRA'S TESTIMONY REGARDING THE SIDE EFFECTS SHE EXPERIENCED FROM HER MEDICATIONS

Vierra testified that the Paxil she was taking for her depression always made her tired and she would fall asleep for a little while. (Tr. 290.) When the vocational expert was asked to include this limitation in the hypothetical, he agreed with counsel's statement that "the person couldn't do even these entry-level unskilled occupations." *Id.*

The ALJ rejected Vierra's testimony solely because "a review of the medical evidence discloses no references to profound sleepiness caused by Paxil." (Tr. 8-9.) While the failure of a patient to mention pain to his doctors and seek treatment for it logically casts doubt on any later testimony by that patient of disabling pain, the same is not true of a patient's failure to mention and/or the doctor's failure to note a medicine's side effect of drowsiness or sleepiness. Particularly where, as here, the medical records do not appear to be complete.

At the first hearing, Vierra testified that Dr. Allan Kelly was the doctor who knew the most about her impairments, but that he was retired. (Tr. 249.) In her Disability Report, Vierra noted that Dr. Cahn had all her medical records, even from her previous doctor. (Tr. 100.) However there do not appear to be any medical records from Dr. Kelly in the administrative file. Vierra noted she first saw Dr. Cahn "12/2002." (Tr. 100.)

Without reviewing Vierra's earlier medical records, it is not possible to know whether or not Vierra discussed any side effects with her prior doctor when she first started taking Paxil. It would seem that the most likely time a patient would discuss side effects with her doctor would be shortly after beginning a medication. The record before the ALJ does not appear to include any medical records showing when Paxil was first prescribed for Vierra, nor what discussions she had with her doctor about side effects before December 2002. The absence of any such notations after December of 2002 is equally consistent with Vierra having decided, before December of 2002 and after discussions with her doctors, that she would put up with the side effects in order to get the relief from her depression.

On this record the lack of any notations in the records about the side effects does not constitute substantial evidence to support the ALJ's rejection of Vierra's testimony regarding the side effects she experienced.[4]

**C. THE ALJ FAILED TO GIVE CLEAR AND CONVINCING REASONS FOR REJECTING THE OPINIONS OF DR. CAHN, SET FORTH IN HIS FEBRUARY 28, 2003 ASSESSMENT**

The basis for the ALJ's apparent rejection of various limitations set forth in Dr. Cahn's February 28, 2003 assessment was that Dr. Cahn "gave no diagnostic information nor any indication of relevant clinical signs and findings to support the assessment." (Tr. 21.) In another portion of her decision, the ALJ reiterated that Dr. Cahn's February 28, 2003 assessment lacked any "narrative

---

[4] In his opposition, Defendant argues there are other facts that could support the ALJ's credibility finding. However, the Ninth Circuit has made a policy decision that courts may not rely on reasoning that was not articulated by the ALJ. *See Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (courts may not affirm the decision of an ALJ on grounds upon which the ALJ did not rely in reaching his decision). And if grounds on which to discredit a claimant's testimony exist, "it is both reasonable and desirable to require the ALJ to articulate them in the original decision." *See Varney II*, 859 F.2d at 1399. Thus, the court declines to consider any alternative support for the ALJ's decision.

statement of diagnoses, signs and symptoms, clinical factors, or other supporting information" and noted that his December 2002 visit note contained "no information supporting the degree of incapacity suggested in the assessment form." (Tr. 23.)

The reasons stated by the ALJ are not clear and convincing reasons for rejecting Dr. Cahn's opinions. If the ALJ wished to know what were the diagnosis and other supporting factors for Dr. Cahn's opinions, she had both the duty and the authority to "conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *See Smolen v. Chater*, 80 F.3d at 1288; *see also Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998) ("if the ALJ needs to know the basis of the doctor's opinion, he has a duty to conduct an appropriate inquiry").

### D.   NO FURTHER DEVELOPMENT OF THE RECORD IS NECESSARY

There are no outstanding issues that must be resolved before a determination of disability can be made. There is no need to conduct any further inquiry regarding the support for Dr. Cahn's opinions because, even without regard to those opinions, the vocational expert testified that if the hypothetical involved an individual who, because of taking Paxil, got drowsy and fell asleep during the workday, that individual could not do even the entry-level jobs he had identified. (Tr. 290.) Because the court finds that Vierra's testimony must be credited pursuant to *Smolen v. Chater*, 80 F.3d 1273, a finding of disability is required regardless of whether or not Dr. Cahn's opinion is credited.

### IV.   CONCLUSION

The ALJ failed to provide legally sufficient reasons for rejecting Vierra's testimony regarding the side effects she experienced from taking Paxil. There are no outstanding issues that must be resolved before a determination of disability can be made. And, it is clear from the record that the ALJ would be required to find Vierra disabled if the testimony regarding side effects were credited. Under *Smolen v. Chater*, 80 F.3d 1273, remand for an immediate award of benefits for the period preceding September 1, 2005, is thus warranted.

Dated: *9/30/08*

PATRICIA V. TRUMBULL
United States Magistrate Judge